# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SAUER INCORPORATED, )
)
      Plaintiff, )
)
    v. )     **CIVIL ACTION NO. 08-92J**
)
HONEYWELL BUILDING )     **JUDGE GIBSON**
SOLUTIONS SES CORPORATION, )
f/d/b/a SEMPRA ENERGY SERVICES, )
)
      Defendant. )

## MEMORANDUM OPINION AND ORDER OF COURT

GIBSON, J.

### I. SYNOPSIS

This matter comes before the Court on a motion for summary judgment (Doc. No. 24) filed

by the Defendant, Honeywell Building Solutions SES Corporation ("Honeywell"), pursuant to

Federal Rule of Civil Procedure 56. The Plaintiff, Sauer Incorporated ("Sauer"), opposes the Motion

for Summary Judgment. For the reasons that follow, the motion will be granted in part and denied

in part.

### II. BACKGROUND

Sempra Energy Services ("Sempra") was the general contractor for a construction project

conducted at the Conemaugh Valley Memorial Hospital ("Conemaugh") in Johnstown,

Pennsylvania. Def.'s Statement of Facts & Pl.'s Counterstatement of Facts at ¶ 1; Doc. Nos. 25-1

& 27 at ¶ 1. At some point in 2006, Honeywell acquired Sempra and became the general contractor

for the project.[1]  On May 10, 2005, Sempra and Sauer executed a subcontract agreement, with an

original value of $3,855,600.00, requiring Sauer to provide mechanical and plumbing work in

connection with the project at Conemaugh.  *Id.* at ¶ 2.

The relevant portions of the subcontract agreement provided as follows:

**5.1**     **Progress Payments.**  Based upon applications for payment submitted to the
Contractor by Subcontractor, Contractor will make progress payments to
Subcontractor for the Work as provided below.

\*\*\*

**5.1.3**  Each Application for Payment must be supported and accompanied by an
executed lien waiver and affidavit attached hereto as Exhibit "B."   If
Subcontractor has purchased materials or subcontracted for work in excess
of Two Thousand Five Hundred Dollars ($2,500.00) from a single supplier
or sub-contractor, said supplier or sub-contractor must also execute the lien
waiver and affidavit, which shall be submitted with the Application for
Payment.  If satisfactory, the Application for Payment will be incorporated
with the Contractor's request for payment and forwarded to the Owner and/or
Third-Party Lender.  If required by Contractor, Owner or Third-Party Lender,
Subcontractor shall furnish any additional documentation pertaining to the
Application for Payment upon request of Contractor.

Def.'s Ex 2, HON 004140; Doc. No. 25-5 at 4.  The "Exhibit 'B'" referenced in Article 5.1.3

contained the following language:

### Exhibit "B"
### Subcontract Lien Waiver and Affidavit Forms

WHEREAS, the undersigned, hereinafter called "Subcontractor," has
performed labor or furnished materials or done both pursuant to the undersigned's
contract with Sempra Energy Services, hereinafter called "Contractor," in connection
with the construction of improvements at [address] owned by [name of owner],
hereinafter called "Owner" and,

WHEREAS, as a result of the foregoing, $_____ is due and payable to

---

[1]  It is not clear from the parties' filings exactly when the transition from Sempra to Honeywell occurred.

Subcontractor from Contractor for the period ending [date] and,

      WHEREAS, Subcontractor has been requested to acknowledge receipt from Contractor of payment of a portion of such sums as are due for the period ending [date] and to release and waive any liens or claims Subcontractor may have or assert against Owner or Contractor or such improvements and real property, or such payment bonds applicable to the construction of improvements, that have arisen by virtue of Subcontractor in connection with construction.

      NOW, THEREFORE, based on payment of such sums due as of _____, Subcontractor hereby waives, relinquishes, and releases its liens, claims, rights and charges of every nature whatsoever which have arisen at law, equity or contract by virtue of such labor and/or materials furnished by said Subcontractor, including any and all mechanic's or materialman's liens and payment bond claims to the extent such monies are due and have been paid as herein stated; provided, however, such waiver, relinquishment and release shall not affect Subcontractor's lien claim and rights with respect to sums which are not due and payable by Contractor to Subcontractor, including sums retained by Contractor and Subcontractor, or Subcontractor's lien claims and rights for sums that become due to Subcontractor after the above said date or which are not now due for the performance by Subcontractor in connection with the construction of such improvements pursuant to the agreement between Contractor and Subcontractor.

Def.'s Ex. 2, HON 004152; Doc. No. 25-5 at 16. During the course of the project, Sauer submitted

twenty progress payment applications to Sempra and Honeywell. Def.'s Statement of Facts & Pl.'s

Counterstatement of Facts at ¶ 7; Doc. Nos. 25-1 & 27 at ¶ 7.

      In a letter dated October 3, 2005, Jim Manion ("Manion"), a project manager for Sauer,

complained to John Schelmbauer ("Schelmbauer"), a Sempra official, about delays associated with

the construction project and the delivery of pre-purchased equipment. Def.'s Ex. 4; Doc. No. 25-7

at 2. By that time, Sauer had already submitted four progress payment applications to Sempra. Doc.

Def.'s Statement of Facts & Pl.'s Counterstatement of Facts at ¶ 8; Nos. 25-1 & 27 at ¶ 8. The first

eighteen progress payment applications submitted by Sauer to Sempra and/or Honeywell were

accompanied by signed "Subcontract and Lien Waiver and Affidavit Forms" in accordance with

3

Article 5.1.3. *Id.* at ¶ 9. After the submission of the eighteenth progress payment application, the cumulative amount of money requested by Sauer constituted the original contract price of $3,855,600.00, including all retainage which had been withheld pursuant to the subcontract agreement, and a net amount of $189,500.00 attributable to change orders. *Id.* at ¶ 11. This application, which was dated December 26, 2006, requested payment for work provided through December 31, 2006. *Id.* at ¶ 10.

The nineteenth progress payment application was submitted by Sauer to Honeywell on February 16, 2007. *Id.* at ¶ 13. This application sought payment for $23,365.00 in change-order work that Sauer had performed in 2006 and $50,000.00 as a partial release of retention money that Honeywell had withheld pursuant to the contract. *Id.* at ¶ 14. The application was accompanied by a "Subcontract Lien Waiver and Affidavit Form" signed by Manion, but the language of the last two paragraphs appearing on the form had been crossed out. Def.'s Ex. 3, HON 004228; Doc. No. 25-6 at 58. On May 8, 2007, Honeywell agreed to release $64,647.84 in retention money. Def.'s Statement of Facts & Pl.'s Counterstatement of Facts at ¶ 15; Doc. Nos. 25-1 & 27 at ¶ 15. Honeywell withheld approximately $30,000.00 in retention money, claiming that Sauer had failed to provide "as-built drawings" and a warranty letter. *Id.*

On May 9, 2007, Sauer's Vice President of Operations, Richard A. McMurdy ("McMurdy"), sent a letter to Robert Kennedy ("Kennedy"), a Honeywell official, claiming that Sauer was owed "delay and inefficiency damages" in the amount of $1,086,432.93. Pl.'s Ex. D, HON 004764; Doc. No. 28-4 at 1. The letter indicated that such damages had resulted from Honeywell's conduct. Pl.'s Ex. D, HON 004764-HON 004767; Doc. No. 28-4 at 1-4. McMurdy's letter stated that Sauer's original bid had been prepared on the assumption that the project would be "substantially" completed

4

by June 23, 2006, and that the project had not actually reached "substantial" completion until March 23, 2007. Pl.'s Ex. D, HON 004766; Doc. No. 28-4 at 3. According to McMurdy, $539,026.94 of the $1,086,432.93 being sought by Sauer was directly attributable to this nine-month delay. *Id.*

Sauer submitted its twentieth progress payment application to Honeywell on May 11, 2007. Def.'s Statement of Facts & Pl.'s Counterstatement of Facts at ¶ 17; Doc. Nos. 25-1 & 27 at ¶ 17. This application was also accompanied by a signed "Subcontract Lien Waiver and Affidavit Form" with the bottom two paragraphs crossed out. Def.'s Ex. 3, HON 004224; Doc. No. 25-6 at 61. Honeywell's Director of Project Delivery, David J. Jones ("Jones"), responded on May 27, 2007, by sending McMurdy a letter containing the following language:

> I am in receipt of your letter dated May 9, 2007 pertaining to Conemaugh Memorial Hospital Medical Center Energy Plant Project and your perceived damages. I have reviewed the information you have provided as well as the subcontract executed by Sauer Vice President, Mr. Geoffery L. Murken on May 13, 2005. As represented in a letter to Mr. Jim Manion from John Schelmbauer dated January 17 2007, Article 4.5 of the contract clearly states that Honeywell SES has no obligation of fiscal compensation for delays of any kind other than an "Equitable Extension of Time", further Sauer took no exception to the terms of this contract other than payment terms as referenced in Exhibit D.
>
> It has come to my attention that Sauer has been crossing out the lien waiver language in your three most recent payment applications. Article 5.3 makes Honeywell SES' obligation to pay Sauer contingent upon receipt of lien waivers. Therefore, Honeywell SES will stop payment on all Sauer payment applications until the appropriate lien waiver documents are received.

Def.'s Ex. 9, HON 004761; Doc. No. 25-7 at 12. On June 15, 2007, McMurdy sent Jones two "Subcontract Lien Waiver and Affidavit Forms" signed by Manion. Def.'s Ex. 10, HON 004218-HON 004220; Doc. No. 25-7 at 14-16. The forms were dated February 16, 2007, and May 11, 2007, in order to correspond with the nineteenth and twentieth progress payment applications that had

previously been submitted by Sauer. Def.'s Ex. 10, HON 004219-HON 004220; Doc. No. 25-7 at 15-16. No portions of the form had been crossed out. *Id.* Nevertheless, the following typed language appeared at the bottom of each form:

> This excludes any claims for delay, disruption and inefficiency which Sauer has already written about under separate cover. Any claims previously documented regarding delays, disruption and inefficiencies remain pending.

*Id.* Honeywell continues to withhold $30,168.94 in retention money, contending that Sauer has not provided documentation in the form of the properly signed releases, "as-built" drawings, and a warranty letter. Def.'s Statement of Facts & Pl.'s Counterstatement of Facts at ¶ 22; Doc. Nos. 25-1 & 27 at ¶ 22.

On March 20, 2008, Sauer commenced the instant action against Honeywell in the Court of Common Pleas of Cambria County, Pennsylvania, asserting claims for breach of contract, unjust enrichment, and alleged violations of Pennsylvania's Contractor and Subcontractor Payment Act ("CASPA") [73 PA. STAT. § 501 *et seq.*]. The action was removed to this Court pursuant to 28 U.S.C. § 1441 on April 14, 2008. Notice of Removal; Doc. No. 1. Honeywell filed a motion for summary judgment on June 1, 2009. Def.'s Mot. for Summ. J.; Doc. No. 24. That motion is the subject of this memorandum opinion.

### III. STANDARD OF REVIEW

Summary judgment may only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Pursuant to Federal Rule of Civil Procedure 56(c), the Court must enter summary judgment against a party who

6

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the non-moving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the non-moving party's burden of proof. *Celotex*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories in order to show that there is a genuine issue of material fact for trial. *Id.* at 324. The non-moving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV. JURISDICTION AND VENUE

The Court has jurisdiction in this case pursuant to 28 U.S.C. § 1332(a)(1). Venue is proper under 28 U.S.C. § 1391(a). The matter is properly before the Court pursuant to the removal provisions of 28 U.S.C. § 1441.

7

## V. DISCUSSION

A federal court exercising diversity-of-citizenship jurisdiction must apply state substantive law and federal procedural law. *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000). Because jurisdiction in this case is based upon the diverse citizenship of the parties, the Court must apply the "choice of law" rules applicable in Pennsylvania. *Thabault v. Chait*, 541 F.3d 512, 535 (3d Cir. 2008). Article 9.6 of the subcontract agreement provides that "all disputes and claims over which federal courts have subject matter jurisdiction" must be litigated "exclusively in the United States District Court for the Southern District of Texas," and in "the corresponding appellate courts." Def.'s Ex. 2, HON 004144; Doc. No. 25-5 at 8. Article 9.9 of the subcontract agreement provides that both the parties and the subcontract agreement itself "shall be governed by the laws of the State of Texas." *Id.* Nevertheless, the plain language of the CASPA declares an agreement "[m]aking a contract subject to the laws of another state or requiring that any litigation, arbitration or other dispute resolution process on the contract occur in another state" to be "unenforceable." 73 PA. STAT. § 514. Thus, the instant case is properly before the Court. Honeywell concedes that Pennsylvania law governs the substantive issues in this case. Def.'s Br. 6, n. 3; Doc. No. 25 at 6, n. 3.

In discerning the content of Pennsylvania law, a federal court must consider both the language of the applicable statutes and the pertinent decisions of the Pennsylvania Supreme Court. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where a decision rendered by the Pennsylvania Supreme Court directly addresses an issue of Pennsylvania law presented to a federal court in a pending diversity action, it controls the resolution of that issue. *Hammond v. International Harvester Co.*, 691 F.2d 646, 650, n. 4 (3d Cir. 1982). Where an issue

8

of Pennsylvania law has not been decided by the Pennsylvania Supreme Court, a federal court must resolve it by considering decisions rendered by other Pennsylvania courts, decisions rendered by federal courts applying Pennsylvania law, and decisions rendered by courts in other jurisdictions addressing similar issues. *Norfolk Southern Railway Co. v. Basell USA, Inc.*, 512 F.3d 86, 91-92 (3d Cir. 2008).

## A. The Effect of the Release Language

Honeywell moves for summary judgment *solely* on the ground that Sauer's claims are barred by the releases signed by Sauer in connection with its progress payment applications. Def.'s Reply Br. 7; Doc. No. 32 at 7. The viability of Sauer's claims is not challenged at this stage in a more general sense. *Id.* In an affidavit signed on July 1, 2009, Manion declared that Sauer had "experienced problems with its work" on the project at Conemaugh "due to Honeywell's mismanagement and interference." Pl.'s Ex. S, Manion Aff. at ¶ 5; Doc. No. 28-19 at ¶ 5. He stated that delivery dates for pre-purchased equipment had been scattered throughout a period of four months rather than confined to an originally-contemplated two-week period, thereby causing such equipment to sit idle for long periods of time and forcing Sauer to spend unanticipated amounts of money to handle, store and transport it. *Id.* at ¶¶ 6-7. Manion further asserted that Sauer's work had been delayed by Honeywell's repeated failure to provide timely and proper design drawings and submittals. *Id.* at ¶¶ 10-11. According to Manion's affidavit, these deficiencies had led to a significant delay in the construction of a utility tunnel. *Id.* at ¶¶ 15-16. Although the tunnel's construction had been scheduled to begin on May 9, 2005, with an expected completion date of November 15, 2005, the construction apparently did not commence until November 1, 2005, leading to a delayed completion date of February 3, 2006. *Id.* The construction evidently interfered with

9

Sauer's access to its work location. *Id.* at ¶ 17. Viewing the evidence in the light most favorable

to Sauer, and considering Honeywell's representation that it seeks summary judgment *solely* on the

basis of the releases (rather than on the basis of other deficiencies in Sauer's claims), the Court

assumes *arguendo* that the damages of which Sauer complains are directly attributable to

Honeywell's "mismanagement and interference."

Article 4.5 of the subcontract agreement provides:

> **Delay by Others.** In the event that Subcontractor's performance of the Work
> is delayed (including a delay in the start of the Work) or interfered with, for
> any reason and for any period of time, by acts or omissions of Owner;
> Contractor; other subcontractor, supplier or vendor; or by reason of fire or
> other casualty, on account of riots, strikes or other combined action of the
> workmen or others; on account of any acts of God; any other cause beyond
> Contractor's control; or on account of any circumstances caused or
> contributed to by Subcontractor, Subcontractor may request an extension of
> time for performance of the Work, but shall not be entitled to any increase in
> the Subcontract Sum, damages or additional compensation as a consequence
> of such delays or interference. Contractor shall grant Subcontractor only an
> equitable extension of time for completion of the Work, and then only if
> written claim for delay is made to Contractor within twenty-four (24) hours
> from the beginning of the delay. Contractor shall not be liable to
> Subcontractor for any monetary claims or damages for delay to
> Subcontractor's Work, regardless of whether such claims are asserted under
> contract, law or equity.

Def.'s Ex. 2, HON 004139; Doc. No. 25-5 at 3. Although Honeywell does not rely on Article 4.5

in support of its motion for summary judgment, the evidence suggests that it relied on this provision

of the subcontract agreement to deny Sauer's requests for delay-related compensation during the

course of the project at Conemaugh. In a letter to Schelmbauer dated July 31, 2006, Manion

submitted a change order request to Sempra in the amount of $185,548.00, seeking compensation

"for the additional costs associated with the projected schedule extension." Pl.'s Ex. A,

10

SAU001220; Doc. No. 28-1 at 1. At that time, Sauer was anticipating that the project would be completed by October 27, 2006, which was eighteen weeks later than the original expected completion date of June 23, 2006. *Id.* Although no written response was sent to Sauer, Manion declared in his affidavit that Honeywell had verbally denied the change order request on the basis of Article 4.5. Pl.'s Ex. S, Manion Aff. at ¶ 55; Doc. No. 28-19 at ¶ 55. Manion responded on January 11, 2007, by submitting a revised change order request in the amount of $369,907.00. Pl.s' Ex. B, SAU001216-SAU001218; Doc. No. 28-2. In his letter to Schelmbauer, Manion stated as follows:

> We herein formally submit for your review our revised change order request for the direct field overhead costs associated with the project schedule extension. This is a revision to our original request submitted July 31, 2006. Sempra Energy Services Company has not furnished a formal response to our original request, only a verbal denial referencing Article 4.5 of our contract with Sempra Energy Services. Article 4.5 stipulates that only "time" will be allowed for any request for damages resulting from delays. The aforementioned verbal denial based upon the "contract language" of Article 4.5 implies that the project could extend indefinitely and Sauer would be due no monetary reimbursement. At this date we project the final completion date to be later than January 31, 2007. This is 31 weeks after the original scheduled project completion date. A 31 week time extension represents a cardinal change to the contract and goes beyond any reasonable interpretation of Article 4.5.

Pl.'s Ex. B, SAU001216; Doc. No. 28-2 at 1. In a written response to Manion dated January 17, 2007, Schelmbauer expressly referenced Article 4.5 as Sempra's basis for "formally" denying Sauer's "claim for additional monies." Pl.'s Ex. M, SAU001215; Doc. No. 28-13. On May 9, 2007, McMurdy sent Kennedy a letter claiming that Honeywell owed Sauer "delay and inefficiency damages" in the amount of $1,086,432.93. Pl.'s Ex. D, HON 004764; Doc. No. 28-4 at 1. In a letter to McMurdy dated May 25, 2007, Jones stated that, pursuant to Article 4.5, Honeywell had incurred "no obligation of fiscal compensation for delays of any kind." Pl.'s Ex. P, HON 004761; Doc. No.

11

28-16.

Under Pennsylvania law, an exculpatory clause such as Article 4.5 is unenforceable where a contractor affirmatively interferes with the work of a subcontractor, or where there is a failure on the part of the contractor to act in some essential matter necessary to the subcontractor's work. *Grimme Combustion, Inc. v. Mergentime Corp.*, 595 A.2d 77, 82-83 (Pa.Super.Ct. 1991). At this stage, Honeywell does not rely on Article 4.5 as a basis for attacking Sauer's claims. Def.'s Reply Br. 7; Doc. No. 32 at 7. Article 4.5 is relevant to the Court's analysis only because Sauer contends that Honeywell's previous reliance on Article 4.5 as a basis for refusing to pay "delay and inefficiency damages" serves to illustrate that, before the commencement of this litigation, neither party understood the releases signed by Sauer in connection with its progress payment applications to constitute a waiver of the claims presently at issue. Pl.'s Br. 11-12; Doc. No. 26 at 11-12. The crux of Sauer's argument is that the releases should not be read as a waiver because the parties themselves never understood them to be read as such. *Id.* at 7-12, 14-19.

Honeywell argues that the language contained in the releases was unambiguous, and that the parties' course of conduct is relevant to the construction of a contractual clause only where the clause itself is ambiguous. Def.'s Reply Br. 3; Doc. No. 32 at 3. In support of its position, Honeywell relies on *G.R. Sponaugle & Sons, Inc. v. Hunt Construction Group, Inc.*, 366 F.Supp.2d 236 (M.D.Pa. 2004). In *G.R. Sponaugle*, the United States District Court for the Middle District of Pennsylvania noted that "courts interpreting the scope of a release [sometimes] speak of factors apart from the language of the release [as] being relevant to its interpretation." *G.R. Sponaugle*, 366 F.Supp.2d at 242, n. 6. Such factors include the circumstances surrounding the execution of the release, and what was within the contemplation of the contracting parties at that time. *Id.* The

12

District Court also observed, however, that where the language of a release is "clear and unambiguous," these extrinsic considerations are directly "controlled by the language of the release itself." *Id.* Honeywell asserts that the parties' course of conduct is irrelevant in this case, since the language of the releases signed by Sauer was unambiguous. Def.'s Br. 10; Doc. No. 25 at 10.

In an attempt to refute Honeywell's position, Sauer calls the Court's attention to *Vaughn v. Didizian*, 648 A.2d 38 (Pa.Super.Ct. 1994). Pl.'s Br. 8; Doc. No. 26 at 8. In *Vaughn*, the Pennsylvania Superior Court explained:

> In this case, the trial court utilized the first component of construing the effect of a release, i.e., examining the ordinary meaning of its language, and concluded that Didizian is covered by the release. However, in limiting its review to the language of the release, the court failed to consider the second component, i.e., a release covers only those matters within the parties' contemplation. In construing this general release, a court cannot merely read the instrument. Instead, it is crucial that a court interpret a release so as to discharge only those rights intended to be relinquished. The intent of the parties must be sought from a reading of the entire instrument, as well as from the surrounding conditions and circumstances. Thus, the trial court erred in failing to construe the language of this general release in light of the conditions and circumstances surrounding its execution.

*Vaughn*, 648 A.2d at 40. Sauer relies on *Vaughn* to support its view that the Court should not consider the language of the releases in isolation, and that the circumstances surrounding the execution of those releases should inform the inquiry as to what the relevant language meant. Pl.'s Br. 7-12; Doc. No. 26 at 7-12.

At first glance, the language used by the Superior Court in *Vaughn* appears to support Sauer's position that the express language contained in the releases should not be regarded as controlling. Nevertheless, the facts in *Vaughn* are clearly distinguishable from the facts in this case. In *Vaughn*, the plaintiff was seriously injured while riding as a passenger in a vehicle involved in an automobile

13

accident caused by the driver's negligence. *Vaughn*, 648 A.2d at 39. In exchange for a sum of money paid to her by the driver, the plaintiff signed a release discharging the driver "and all other persons, firms and corporations from all claims and demands, rights and causes of action of any kind the undersigned [plaintiff] now has or hereafter may have on account of or in any way growing out of personal injuries known or unknown to [the plaintiff] at the present time . . . resulting or to result from" the accident. *Id.* Several months later, an orthopedic surgeon performed surgery on the plaintiff for the purpose of repairing spinal damage that had resulted from the accident. *Id.* The plaintiff later commenced a medical malpractice action against the surgeon, contending that the surgery had been performed in a negligent manner. *Id.* The surgeon attempted to rely on the release that had previously been signed by the plaintiff as a basis for defeating the action. *Id.* at 39-40. The Superior Court held that the plaintiff's malpractice action was not barred by the release, since the surgeon's allegedly negligent medical treatment had not been within the contemplation of the plaintiff and the driver at the time of the release's execution. *Id.* at 40-41. In so holding, the Superior Court emphasized that the cause of action pursued by the plaintiff had not accrued until *after* the execution of the release. *Id.* at 41. The decision in *Vaughn* was simply an application of a more generalized rule of construction requiring the language of a release to be strictly construed to avoid the waiver of a claim that had not accrued as of the date of the release's execution.[2] *Henry Shenk Co. v. Erie*, 43 A.2d 99, 102 (Pa. 1945).

    The instant case does not involve a situation like that in *Vaughn*, in which the claim alleged

---

    [2] Although *general* releases are not construed to discharge claims that have not yet accrued, contracting parties are nevertheless free to *specifically* discharge future claims if they choose to do so. The rule of construction disfavoring the waiver of future claims does not preclude parties from waiving such claims by means of a release that unambiguously has such a prospective application. *Camiolo v. State Farm Fire & Casualty Co.*, 334 F.3d 345, 360-362 (3d Cir. 2003).

14

to have been waived was a step removed from the actual release at issue. If the claims that Sauer now wishes to pursue *were not* waived when the releases were signed, it is difficult to fathom what claims *were* waived. By arguing that the Court should look beyond the language contained in the releases in determining the intent of the contracting parties, Sauer implicitly acknowledges that the relevant language was clear and unambiguous. Although Sauer argues that the releases did not constitute a waiver of its claims, it offers no alternative construction of the release language. Pl.'s Br. 7-12; Doc. No. 26 at 7-12. The problem with Sauer's argument is that it begs the question. Sauer purports to explain how the language of the releases *should not* be construed without explaining how that language *should* be construed.[3]

Where a release contains a clear and unambiguous waiver of a claim, a contracting party cannot evade the effect of that release by contending that it did not subjectively intend to waive the claim at issue. *Jordan v. SmithKline Beecham*, 958 F.Supp. 1012, 1019-1020 (E.D.Pa. 1997). Moreover, a release that bars *unknown* claims will be enforced even if one of the parties was unaware of the waiver at the time of the release's execution. *Bickings v. Bethlehem Lukens Plate*, 82 F.Supp.2d 402, 406 (E.D.Pa. 2000). Sauer does not appear to dispute that the releases that it submitted to Sempra and Honeywell in connection with its progress payment applications contained unambiguous *language*, and that such *language* purports to bar its claims against Honeywell. For this reason, the Court need not look beyond the language of the releases in determining the intent of

---

[3] "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Madison Construction Co. v. Harleysville Mutual Insurance Co.*, 735 A.2d 100, 106 (Pa. 1999), quoting *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (Pa. 1986). By failing to propose a construction of the applicable release language that differs from the one posited by Honeywell, Sauer implicitly concedes that the unaltered release language cannot be read in a manner which preserves its claims for "delay and inefficiency damages."

15

the contracting parties at the time that the releases were executed. *Camiolo v. State Farm Fire & Casualty Co.*, 334 F.3d 345, 361 (3d Cir. 2003); *G.R. Sponaugle*, 366 F.Supp.2d at 242-243. The plain language of the releases must be given effect. If it were otherwise, every release would be subject to attack whenever a contracting party has a change of heart. *Taylor v. Solberg*, 778 A.2d 664, 667-668 (Pa. 2001) ("If such a release can be nullified or circumvented, then every written release and every written agreement of any kind, no matter how clear and pertinent, can be set aside whenever one of the parties changes its mind or the injured party receives an inadequate settlement.").

Even if the Court were able to consider the parties' course of conduct in ascertaining the meaning of the language contained in the releases, Sauer would be unable to circumvent the clear import of its waiver. If Sauer did not believe that its submission of the executed releases in connection with its first eighteen progress payment applications had constituted a waiver of its claims for "delay and inefficiency damages," it would not have found the need to cross out the applicable language when it submitted its nineteenth and twentieth applications, or to add additional language preserving its claims after Honeywell had rejected the applications containing the crossed-out release language. By expressly altering the content of the release language in connection with its nineteenth and twentieth progress payment applications, Sauer implicitly acknowledged that the unaltered release language had contemplated a waiver of the very claims that it was seeking to pursue. *ILM Systems, Inc. v. Suffolk Construction Co.*, 252 F.Supp.2d 151, 160 (E.D.Pa. 2002). In this respect, the parties' course of conduct does not provide support for Sauer's alternative (and *unspecified*) construction of the release language.

Sauer argues that Honeywell implicitly acknowledged that the releases had not waived prior

16

claims for compensation by honoring six separate change order requests for $4,187.00, $2,303.00, $4,164.00, $9,958.00, $998.00 and $1,769.00. Pl.'s Br. 10-11; Doc. No. 26 at 10-11. These change order requests, which were referenced in Manion's affidavit, were submitted between May 5, 2006, and October 13, 2006. Pl.'s Ex. S, Manion Aff. at ¶¶ 18-52; Doc. No. 28-19 at ¶¶ 18-52. In any event, Honeywell's decision to honor Sauer's change order requests was of no significance, since neither Honeywell nor Sempra ever disputed that Sauer was entitled to the sought-after compensation. *G.R. Sponaugle*, 366 F.Supp.2d at 244. Even if such conduct on the part of Honeywell had been probative as to how *ambiguous* release language should be construed, it would not provide a sufficient basis for Sauer to overcome the *unambiguous* release language at issue in this case. *Camiolo*, 334 F.3d at 360-362.

Sauer contends that its submission of eighteen unaltered releases was unsupported by consideration. Pl.'s Br. 6-7; Doc. No. 26 at 6-7. Under the present circumstances, however, Sauer's argument cannot carry the day. It is undisputed that Article 5.1.3 of the subcontract agreement required Sauer to submit the signed releases along with its progress payment applications. Def.'s Ex. 2, HON 004140; Doc. No. 25-5 at 4. It has been held that "a release required by the provisions of a contract is supported by the same consideration that supports the contract itself." *Yakima Asphalt Paving Co. v. Washington State Dept. of Transportation*, 726 P.2d 1021, 1024 (Wash.Ct.App. 1986). While the *presence* or *absence* of consideration may be a relevant factor in certain instances, "the *adequacy* of consideration is not a factor to be considered in determining the validity and enforceability of a contract." *Adelvision, L.P. v. Groff*, 859 F.Supp. 797, 804 (E.D.Pa. 1994) (emphasis added). Since "the contract itself" was supported by *some* consideration, Sauer cannot evade the clear import of its releases by claiming that no specific consideration supported

17

their execution and submission.

Honeywell contends that it is entitled to summary judgment with respect to *all* of Sauer's claims. Def.'s Br. 13; Doc. No. 25 at 13. The unambiguous nature of the release language, however, is a double-edged sword for Honeywell. The applicable language clearly and unambiguously provided that Sauer's "waiver, relinquishment and release" did not affect its "lien claim and rights for sums" becoming due after the dates of the respective progress payment applications and corresponding releases. Def.'s Ex. 2, HON 004152; Doc. No. 25-5 at 16. The signed release submitted by Sauer in connection with its eighteenth progress payment application waived claims which had accrued as of December 20, 2006. Def.'s Ex. 3, HON 004231; Doc. No. 25-6 at 55. It did not waive any claims accruing subsequent to that date. By altering the language of the releases that it submitted with its nineteenth and twentieth progress payment applications (i.e., by initially crossing out the applicable waiver language and later adding additional language preserving its claims), Sauer unambiguously refused to waive any subsequent "claims for delay, disruption and inefficiency." Def.'s Ex. 10, HON 004219-HON 004220; Doc. No. 25-7 at 15-16. The documentary evidence indicates that the project at Conemaugh was not "substantially" completed until March 23, 2007. Pl.'s Ex. D, HON 004766; Doc. No. 28-4 at 3. To the extent that Sauer's claims for "delay and inefficiency damages" are attributable to conduct occurring subsequent to December 20, 2006, they are *not* barred by the releases submitted in connection with the first eighteen progress payment applications.[4] Therefore, Honeywell's motion for summary judgment will be granted to the extent

---

[4] It is not clear from the parties' filings whether any of the damages allegedly sustained by Sauer are attributable to conduct occurring subsequent to December 20, 2006. The Court notes that Sauer's formal request for $1,086,432.93 in "delay and inefficiency damages" was not submitted to Honeywell until May 9, 2007. Pl.'s Ex. D, HON 004764; Doc. No. 28-4 at 1.

that it is based on conduct occurring on or before December 20, 2006, and denied to the extent that it is based on conduct occurring after that date. Since Honeywell moves for summary judgment *solely* on the basis of the releases signed by Sauer in connection with its progress payment applications, the Court expresses no opinion concerning the viability of Sauer's claims in a more general sense.

## B. The CASPA Claims

Honeywell moves for summary judgment with respect to Sauer's claims under the CASPA. Def.'s Br. 12-13; Doc. No. 25 at 12-13. It is undisputed that Honeywell continues to hold $30,168.94 in retainage. Def.'s Ex. 1, Schelmbauer Aff. at ¶ 19; Doc. No. 25-4 at ¶ 19; Pl.'s Ex. S, Manion Aff. at ¶ 63; Doc. No. 28-19 at ¶ 63. Honeywell argues that it is entitled to hold this amount of money in retainage until Sauer provides unaltered releases, "as-built" drawings, and other close-out documentation. Def.'s Br. 13; Doc. No. 25 at 13. Sauer contends that it has already submitted the "as-built" drawings to Honeywell. Pl.'s Br. 20; Doc. No. 26 at 20.

Honeywell's internal documents suggest that the final $30,168.94 in retainage was to be released to Sauer after the appropriate close-out documentation was provided. In an email message sent at 7:20 A.M. on the morning of May 8, 2007, Schelmbauer instructed Debby Malone ("Malone"), a construction associate employed by Honeywell, to release all retainage except for approximately $30,000.00. Def.'s Ex. 6, HON 002948; Doc. No. 25-7 at 6. He indicated that some amount of money needed to be retained until Honeywell received "the as-built drawings" and "a warranty letter." *Id.* Later that day, in an email message sent at 12:17 P.M., Malone informed Cheryl Mihealsick ("Mihealsick") that "the rest" of the retainage would be released when Honeywell received the "as-built" drawings from Sauer. Def.'s Ex. 7, HON 001954; Doc. No. 25-7 at 8. On

19

May 9, 2007, Sauer submitted documentation to Honeywell. Pl.'s Ex. T; Doc. No. 28-20. This documentation purported to contain the "as-built" drawings that Honeywell had requested. *Id.* In an email message to Robert Miller ("Miller"), Manion expressed the view that this submission had contained all necessary close-out documentation. *Id.*

It is not entirely clear from the record whether Honeywell was dissatisfied with the "as-built" drawings submitted by Sauer. In an affidavit signed on June 1, 2009, Schelmbauer declared that Honeywell was still holding $30,168.94 in retainage because Sauer had not provided contractual close-out documentation, including the signed releases specified in the subcontract agreement. Def.'s Ex. 1, Schelmbauer Aff. at ¶ 19; Doc. No. 25-4 at ¶ 19. He did not specify what other documentation was required. *Id.*

In support of its position that it was justified in withholding $30,168.94 in retainage, Honeywell points to 73 PA. STAT. § 509(b), which provides that "[i]f an owner is not withholding retainage, a contractor may withhold retainage from a subcontractor in accordance with their agreement." Def.'s Br. 13; Doc. No. 25 at 13; Def.'s Reply Br. 9; Doc. No. 32 at 9. Nevertheless, Honeywell conveniently omits the second sentence of that same statutory provision, which provides that "[t]he retainage shall be paid within 30 days after final acceptance of the work." 73 PA. STAT. § 509(b). Sauer contends that the owner has already accepted the work at Conemaugh. Pl.'s Br. 19; Doc. No. 26 at 19. Honeywell does not appear to argue otherwise. Given this uncertain state of the record, the Court cannot conclude as a matter of law that Sauer is not entitled to the remedies available under the CASPA. Accordingly, Honeywell's motion for summary judgment will be denied with respect to Sauer's CASPA claims.

20

## VI. CONCLUSION

Honeywell moves for summary judgment *solely* on the ground that Sauer's claims are barred by the signed releases submitted in connection with the progress payment applications. Def.'s Reply Br. 7; Doc. No. 32 at 7. The motion for summary judgment is not premised on any other theory. Therefore, the Court has no occasion to consider other issues concerning the viability of Sauer's claims under Pennsylvania law. The language contained in the releases was unambiguous, and Sauer proposes no alternative construction of that language. Hence, Sauer's claims are barred by the releases to the extent that they are based on conduct occurring on or before December 20, 2006, which was the date of the last unaltered release. Honeywell's motion for summary judgment (Doc. No. 24) will be granted as to Sauer's claims based on conduct occurring on or before December 20, 2006, and denied in all other respects. The motion for summary judgment will be denied with respect to Sauer's CASPA claims, since the Court cannot conclude as a matter of law that Sauer is not entitled to the remedies available under that statute. An appropriate order follows.

**AND NOW**, this 21st day of September, 2010, this matter coming before the Court on the Motion for Summary Judgment filed by the Defendant (Doc. No. 24), IT IS HEREBY ORDERED that the Motion for Summary Judgment is **GRANTED** as to any claims asserted by the Plaintiff based on conduct occurring on or before December 20, 2006, and **DENIED** in all other respects.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:   All counsel of record